**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| LIVINGSTONE FLOMEH-MAWUTOR, | ) ) ) | |
| Plaintiff, pro se, | ) ) | **ORDER,** |
| | ) | **MEMORANDUM OPINION,** |
| v. | ) ) | **AND RECOMMENDATION** |
| TRIUMPH, LLC, | ) ) | 1:08CV676 |
| Defendant. | ) ) | |

This matter is before the court on Defendant Triumph, LLC's Motion for Summary Judgment (docket no. 16). Also before this court is Defendant's Motion to Strike Plaintiff's response and memorandum in opposition to Defendant's motion for summary judgment (docket no. 23). Plaintiff has responded to Defendant's motions. In this posture, the matter is ripe for disposition. Furthermore, the parties have not consented to the jurisdiction of the magistrate judge; therefore, the motion for summary judgment must be addressed by recommendation. For the following reasons, Defendant's motion to strike will be granted in part and denied in part. Furthermore, it will be recommended that the court grant Defendant's motion for summary judgment.

## I. PROCEDURAL BACKGROUND

Plaintiff Livingstone Flomeh-Mawutor filed this pro se action on September 19, 2008, asserting that his former employer Defendant Triumph, LLC ("Defendant" or

"Triumph") terminated his employment due to his race and/or national origin under 42 U.S.C. § 2000e-2(a)(1) ("Title VII").  Plaintiff requests declaratory judgment, compensatory damages, and other appropriate relief.  In the motion for summary judgment filed September 30, 2009, Defendant contends that summary judgment is proper as to all claims because there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law.  In the motion to strike, Defendant contends that Plaintiff's response and memorandum in opposition to Defendant's motion for summary judgment are improper under the Federal Rules of Civil Procedure and the local rules of this court.

## II.  FACTUAL BACKGROUND

Defendant Triumph, LLC is a human services provider, offering community based treatment plans.  Triumph hired Plaintiff in March 2007 as a mental health specialist in the Assertive Community Treatment Team.  Plaintiff was born in the West African country of Ghana and came to the United States on a Student Visa in the early 1980s.  (Pl.'s Dep. 16.)  Plaintiff's immediate supervisor at Triumph was Stacy Smith.  Smith made the decisions both to hire and to fire Plaintiff.

Smith interviewed and hired Plaintiff in March 2007.  At the time, Smith thought that Plaintiff was a "qualified professional with good experience."  (Decl. of Stacy Smith ¶ 4.)  Smith was particularly impressed with Plaintiff's "drumming therapy skills" and thought that his ethnic diversity would be an asset for the team.

(*Id.*) Plaintiff remembers Smith telling him she was glad to have found him and that she thought Plaintiff would bring very good skills to the group. (Pl.'s Dep. 87.)

In Plaintiff's first weeks at Triumph, Triumph provided Plaintiff with a copy of the company's Equal Employment Opportunity Policy. The policy states that Triumph does not discriminate in employment opportunities or practices; it encourages employees with concerns to contact management with those concerns without fear of reprisal. (Pl.'s Dep. 89-90, Def.'s Dep. Ex. 14, attached to docket no. 17.) Triumph also provided Plaintiff with the training he would need to complete his job duties. Plaintiff was specifically trained about the importance of Medicaid compliance and understood that it was his responsibility to develop a person-centered plan with his clients and then obtain approval from Medicaid in order to secure funding for the services provided. (Pl.'s Dep. 135-36.)

By all accounts, the first few months of Plaintiff's employment at Triumph ran smoothly and Plaintiff received positive reviews from his supervisors. An administrative supervision form, dated March 9, 2007, notes that Plaintiff is "cooperative" and "expresses concerns professionally." (Pl.'s Ex. 1.) A similar form, dated April 24, 2007, lists Plaintiff's strengths as "flexibility and excellent ideas." (*Id.*) Another form, dated May 16, 2007, again praises Plaintiff for his mature attitude and thoughtfulness with clients. (*Id.*)

In May 2007 Plaintiff's supervisor Smith began to notice problems with Plaintiff's job performance. On May 8, 2007, Smith discovered that Plaintiff had

failed to properly obtain Medicaid authorizations for his client services. (Decl. of Stacy Smith ¶ 9.) Although Smith counseled Plaintiff not to repeat the mistake, Smith discovered similar mistakes made by Plaintiff on August 8, 2007, and September 6, 2007. (*Id.*) An administrative supervision form, dated May 16, 2007, also lists areas where Plaintiff needed to improve his performance. (Pl.'s Ex. 1.) The form indicates that Plaintiff had problems with time management, prioritizing clients, and familiarity with documentation. (*Id.*)

Before terminating Plaintiff's employment, Smith issued Plaintiff formal written warnings regarding his poor performance on two separate occasions. On September 14, 2007, after Plaintiff missed another authorization deadline, Smith met with Plaintiff to discuss his job performance. Specifically, they discussed a Medicare authorization deadline that Plaintiff missed on September 13, 2007. The meeting resulted in Smith issuing Plaintiff his first formal written warning, a Record of Corrective Action. (Def.'s Dep. Ex. 22.) In the Record of Corrective Action, Smith wrote that "on three separate occasions, authorizations have been left undone, done incorrectly, not responded to in a timely manner." (*Id.*) Further, "staff member told supervisor that progress had been made when it had not been made." (*Id.*) The Record of Corrective Action issued to Plaintiff included a clause that described the document as "a notice of a formal warning," and provided that "[r]ecurrence of the above or continued unacceptable performance could result in further disciplinary action up to and including termination." (*Id.*) To atone for his unacceptable

performance, Plaintiff was required to apologize to his team members and email his supervisors an "explanation about the potential loss of [$]2600.00 of revenue due to missing the VO deadline." (*Id.*)

Plaintiff's job performance did not improve. In November 2007, Plaintiff submitted a request for two weeks of vacation, which Smith approved contingent upon Plaintiff's successful completion of several pending projects, including Medicare Authorizations. Smith hand wrote descriptions of the projects on Plaintiff's request form and discussed the projects with Plaintiff. Plaintiff, however, left for vacation without completing the assigned projects. As a result of the incomplete assignments, Smith issued Plaintiff his second Record of Corrective Action. (Def.'s Dep. Ex. 31.) Though Smith was "dumbfounded" by Plaintiff's actions, she "discussed the problem with him, told him not to make any further mistakes and indicated strategies that Livingstone could employ to avoid repeating his mistake." (Decl. of Stacy Smith ¶ 13.)

Triumph terminated Plaintiff's employment on March 12, 2008. The events leading up to Plaintiff's termination commenced in November 2007, when the government performed an audit of Triumph's Assertive Care Treatment Team records. (*Id.* ¶ 15.) The following March, the North Carolina Department of Health and Human Services Division of Medical Assistance ("DHHS") directed Triumph to conduct a post Medicaid self-audit of several records. While performing the audit of the records specified by DHHS, Smith found "a serious problem" with Plaintiff's

record-keeping. (*Id.* ¶ 16.) One of Plaintiff's Personal Care Plans contained discrepancies between the dates when Plaintiff actually visited clients and the dates beside the clients' signatures that were purportedly obtained on those visits. (*See id.* ¶¶ 17-24.) Plaintiff admits that the record in question was made by him. (Pl.'s Dep. 189-90.) Upon noticing the problem records, Smith was very concerned that the "records would be viewed as fraud by [the government]." (Decl. of Stacy Smith ¶ 25.) Smith then spoke with Triumph's Western Division Director Shawn Godfrey about the situation and they agreed that Plaintiff "had at least been very sloppy in filling out the records, or in the worst case, had back-dated the signature in a dishonest attempt to bill Medicaid for services performed prior to the client signing the PCP." (Decl. of Shawn Godfrey ¶ 13.) Based on the discrepancies found in the audit and Plaintiff's prior performance problems, Godfrey and Smith decided to terminate Plaintiff's employment on March 12, 2008. (Decl. of Stacy Smith ¶ 25.)

### III. ANALYSIS

#### A. Summary Judgment Standard

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its

burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact-finder to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

### B. Motion to Strike

The court has carefully examined the portions of the response and memorandum that Defendant wants stricken. To the extent that portions of the challenged documents do not comply with Rule 56(e), they will not be considered on Defendant's motion for summary judgment. Thus, to this extent, Defendant's motion to strike will be granted in part and denied in part.

### C. Title VII Claim

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). To survive a motion for summary judgment on his discriminatory discharge claim, Plaintiff must either present direct evidence of discrimination or establish that the employer's proffered reasons for termination were a pretext for unlawful discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). As Plaintiff has submitted no direct evidence of racial discrimination, the court will examine Plaintiff's claims under the burden-shifting framework of *McDonnell Douglas*.

Under the burden-shifting framework of *McDonnell Douglas*, Plaintiff must first establish a prima facie case of discrimination, which creates an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of discriminatory discharge, Plaintiff must show (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) at the time of the adverse employment action he was performing at a level that met his employer's legitimate job expectations; and (4) that the position remained open to or was filled by similarly qualified applicants outside the protected class. *Jones v. Southcorr, L.L.C.*, 324 F. Supp. 2d 765, 780-81 (M.D.N.C. 2004).

Once Plaintiff has demonstrated a prima facie case, which creates only an inference of discrimination, the burden shifts to Defendant to rebut that inference by providing legitimate, nondiscriminatory reasons for the adverse action. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (citing *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985)). Assuming that Defendant does so, the burden then reverts to Plaintiff to "establish by a preponderance of the evidence that the proffered reasons are pretextual." *Id.* To this end, Plaintiff must prove that "the legitimate reasons offered by [Defendant] were not [the] true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The federal courts do not serve to second-guess workplace decisions; thus, the claim cannot be based on mere disagreement with the employment decision. *See DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998). In addition, Plaintiff must come forward with admissible evidence that is more than self-serving opinions or speculation. *See Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). Finally, while the *McDonnell Douglas* framework involves a shifting back and forth of the evidentiary burden, the employee retains at all times the ultimate burden of persuading the trier of fact that the employer discriminated against him in violation of Title VII. *See Burdine*, 450 U.S. at 253. Nevertheless, "the burden of establishing a prima facie case of disparate treatment is not onerous." *Id.*

Though it is undisputed that Plaintiff has met the first two steps of proving a prima facie case of racial discrimination (i.e., he is a member of a protected class and was fired), Plaintiff has ultimately failed to establish a prima facie case of discriminatory discharge under Title VII because he has not shown that his performance met Triumph's legitimate job expectations at the time of his termination. When assessing whether a plaintiff was meeting his employer's legitimate job expectations when he was terminated, "the crux of the inquiry is not Plaintiff's assessment of [his] job performance, but the perception of the employer." *Salter v. Alltel Commc'ns, Inc.*, 407 F. Supp. 2d 730, 735 (E.D.N.C. 2005). Thus, on a motion for summary judgment, a plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [the plaintiff] was meeting [the employer's] expectations." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

Two recent cases are instructive in determining whether Plaintiff has demonstrated that he was meeting Triumph's legitimate expectations at the time of his termination. In *Purchase v. Astrue*, the defendant submitted evidence showing that the plaintiff required regular assistance with routine claims, and forms she completed frequently contained errors that caused delays. 539 F. Supp. 2d 823, 828 (E.D.N.C. 2008). The court found that the defendant was entitled to summary judgment because no reasonable fact-finder could conclude that the plaintiff was meeting the defendant's legitimate job expectations at the time of her termination,

given that "[t]he record [was] replete with evidence showing that [the plaintiff] failed to properly perform the most basic aspects of her job." *Id.*

A recent Fourth Circuit case, *Warch v. Ohio Casualty Insurance Co.*, is also analogous to this case. 435 F.3d 510 (4th Cir. 2006). In *Warch*, before the plaintiff was terminated, the plaintiff's supervisors "advised him on several occasions concerning [company] procedures and informed him that he continued to suffer from shortcomings that adversely impact[ed his] personal performance and that of the unit." *Id.* at 517 (quotations omitted). The court found that the plaintiff could not demonstrate that he met his employer's legitimate job expectations and held that the defendant was entitled to summary judgment because, before the plaintiff's termination, the employer had "reprimanded [the plaintiff] based on concrete, specific observations and accompanied its reprimands with explicit instructions on how to improve." *Id.* at 517-18.

Here, like the plaintiff in *Purchase*, the record is replete with evidence showing that Plaintiff's performance was substandard. Plaintiff was reprimanded multiple times for failing to complete Medicaid authorization forms. He received two formal Record of Corrective Action forms, warning him that "recurrence of the above or continued unacceptable performance could result in further disciplinary action up to and including termination." (Def.'s Dep. Ex. 22.) Moreover, similar to the defendant in *Warch*, Triumph reprimanded Plaintiff "based on concrete, specific observations and accompanied its reprimands with explicit instructions how to improve." *Warch*,

435 F.3d at 517-18. Each Record of Corrective Action detailed Plaintiff's transactions and outlined an "Action Plan" designed to "[i]ndicate steps that must be taken to improve performance, includ[ing] specific goals and measurements." (Def.'s Dep. Exs. 22, 31.) In addition, after Plaintiff received his second Record of Corrective Action, his supervisor Smith "discussed the problem with him, told him not to make any further mistakes and indicated strategies that [Plaintiff] could employ to avoid repeating his mistake." (Decl. of Stacy Smith ¶ 13.) Plaintiff, however, did not improve his performance and was terminated.

In sum, Plaintiff has not presented evidence, other than his own testimony, to show that he was meeting Triumph's legitimate job expectations when he was fired. Plaintiff's "own testimony . . . cannot establish a genuine issue as to whether [plaintiff] was meeting [the employer's] expectations." *King*, 328 F.3d at 149. Thus, Plaintiff has not demonstrated, and no reasonable jury could conclude, that he was meeting Defendant's legitimate job expectations when he was fired. Plaintiff has not established a prima facie case of discriminatory discharge, and Defendant is entitled to summary judgment.

## IV. CONCLUSION

For the reasons set forth herein, it is **RECOMMENDED** that summary judgment (docket no. 16) be **GRANTED** for DEFENDANT. Furthermore, **IT IS ORDERED** that Defendant's motion to strike (docket no. 23) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that the parties stand down from final trial preparation unless directed otherwise by the district judge (this direction has no bearing on the settlement conference scheduled for March 23, 2010).

_____
WALLACE W. DIXON
United States Magistrate Judge

March 26, 2010